# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **WALTER SCOBLE** | * | CASE NO. |
| 2841 136TH Street | * | |
| Toledo, OH  43611 | * | JUDGE |
| | * | |
| And | * | **COMPLAINT WITH JURY DEMAND** |
| | * | **ENDORSED THEREON** |
| **ANNA SCOBLE** | * | |
| 2841 136th Street | * | David W. Zoll (0008548) |
| Toledo, OH 43611 | * | Michelle L. Kranz (0062479) |
| | * | Pamela A. Borgess (0072789) |
| And | * | ZOLL & KRANZ, LLC |
| | * | 6620 W. Central Ave., Suite 200 |
| **DESMOND FLETCHER** | * | Toledo, OH  43617 |
| 1225 Oakhill Court | * | (419) 841-9623 |
| Apt. 282 | * | Fax: (419) 841-9719 |
| Toledo, OH  43614 | * | Email: david@toledolaw.com |
| | * | michelle@toledolaw.com |
| And | * | pamela@toledolaw.com |
| | * | |
| **TIMOTHY MCKIBBEN** | * | |
| 1920 Collingwood | * | |
| Penthouse 5 | * | |
| Toledo, OH  43624 | * | |
| | * | |
| And | * | |
| | * | |
| **ROBERT HOWE** | * | |
| 3634 Drummond Road | * | |
| Toledo, OH  43613 | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| **C/O CT SERVICES, INC.** | * | |

1300 East 9th St.                          *
Cleveland, Ohio 44114                      *
                                           *
                    Defendant.             *
                                           *
                                           /

Now comes Plaintiff, by and through counsel, and for their Complaint with Jury Demand states as follows:

### Jurisdictional Statement

1.      This action is brought pursuant to 28 U.S.C. § 1332.  Plaintiffs aver that the amount in controversy clearly exceeds seventy-five thousand ($75,000.00) dollars and the controversy arises between citizens of different states as is required by the statute to invoke "diversity of citizenship" jurisdiction of this Court.

### Parties

2.      Plaintiff Walter Scoble and his spouse, Plaintiff Anna Scoble are, and have been at all times relevant, citizens of the State of Ohio, in Toledo, Lucas County, Ohio.

3.      Walter Scoble was prescribed and took Vioxx in that county and Plaintiffs bring this action to recover damages for personal injuries sustained as a result of taking Vioxx, to wit: a stroke in July, 2004.

4.      Plaintiff Desmond Fletcher is, and has been at all relevant times, a citizen of the State of Ohio, in Toledo, Lucas County, Ohio.

5.       Plaintiff Desmond Fletcher was prescribed and took Vioxx in that county and brings this action to recover damages for personal injuries sustained as a result of taking Vioxx, to wit, a myorcardial infarction in October, 2004.

6.      Plaintiff Tim McKibben is, and has been at all relevant times, a citizen of the State of Ohio, in Toledo, Lucas County, Ohio

7. Plaintiff Tim McKibben was prescribed and took Vioxx in that county and brings this action to recover damages for personal injuries sustained as a result of taking Vioxx, to wit, a myocardial infarction in June of 2001.

8. Plaintiff Robert Howe is, and has been at all relevant times, a citizen of the State of Ohio, in Toledo, Lucas County, Ohio.

9. Plaintiff Robert Howe was prescribed and took Vioxx in that county and brings this action to recover damages for personal injuries sustained as a result of taking Vioxx, to wit, a myocardial infarction in April, 2005.

10. Defendant Merck & Co., Inc. ("Merck") is and was at all times pertinent herein a corporation and/or a partnership for profit, incorporated under the laws of New Jersey, with its principle place of business being located in Whitehouse Station, New Jersey.

11. At all times relevant hereto, Merck was registered to do and was going business in the State of Ohio.

12. Merck may be served with a complaint as follows: Merck & Co., Inc., c/o Registered Agent CT Services, Inc., 1300 East 9th St., Cleveland, Ohio 44114.

### Substantive Allegations

13. At all times relevant and material hereto, Defendant has conducted continuous and substantial business in the State of Ohio.

14. At all times relevant and material hereto, Defendant acted and gained knowledge itself and by and through its various agents, servants, employees and/or ostensible agents.

15. Plaintiff maintains that the pharmaceutical drug Vioxx is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings as to the dangers associated with its use.

16.     At all relevant times, Merck was in the business of developing, researching, selling, distributing, designing, manufacturing, testing, evaluating, licensing, labeling and/or marketing, either directly or indirectly through third parties or related entities, pharmaceutical drugs including Vioxx.

17.     At all relevant times, Merck did in fact develop, research, sell, distribute, design, manufacture, test, evaluate, license, label, and/or market, either directly or indirectly through third parties or related entities, pharmaceutical drugs, including Vioxx.

18.     During the time period from 1999 until 2001 Plaintiff was prescribed and took as directed the Defendant's drug Vioxx.

19.     As a direct and proximate result of the liability-producing conduct of Defendant and the defective and unreasonable dangerous condition of its product Vioxx, Plaintiff suffered physical injury and damage. Plaintiff first became aware of the existence of her cause of action and the defects in VIOXX on or about September 30, 2004.

20.     Vioxx is the brand name of rofecoxib, one of a class of drugs called COX-2 (cyclooxygenase-2) inhibitors which work to induce inflammation and pain by providing analgesic and anti-inflammatory benefits to persons with, among other conditions, arthritis and muscle pain.

21.     Merck submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food & Drug Administration on November 23, 1998 for tablets at doses of 12.5 and 25 mg. for relief of the signs and symptoms of osteoarthritis, the management of acute pain and the treatment of primary dysmenorrheal.  This application was denoted NDA 21-042 by the FDA.

22.     Merck also submitted an NDA for rofecoxib to the FDA on November 23, 1998 for oral suspension at doses of 12/5mg/mL and 25 mg/mL for relief of the signs and symptoms of osteoarthritis, the management of acute pain and the treatment of primary dysmenorrhea.  This application was denoted NDA 21-052 by the FDA.

23.     On or about May 20, 1999 the FDA approved NDA 21-042 and NDA 21-052 for rofecoxib, for relief of the signs and symptoms of osteoarthritis, the management of acute pain and the treatment of primary dysmenorrhea.

24.     Thereafter, the events set forth below took place:

25.     On December 16, 1999, the FDA sent Merck an official warning letter complaining that the promotion pieces that promoted Vioxx (rofecoxib) were false and misleading because they contained misrepresentations of Vioxx's safety profile, unsubstantiated comparative claims and were lacking in fair balance.

26.     In 2000, researchers began warning about the drug's possible cardiovascular risks. According to the Washington Post, which interviewed independent researchers who collected and reviewed the Vioxx data, there was data from a company study that found users had four times as many heart attacks and strokes as those who used another pain killer.  Nevertheless, Merck repeatedly reassured the medical and financial communities that Vioxx was safe.

27.     In March 2000, a study (VIGOR) found Vioxx patients had double the rate of serious cardiovascular problems than those on naproxen, an older nonsteriodal anti-inflammatory drug (NSAID).  The VIGOR data revealed that:  (a) patients on Vioxx were five times more likely to suffer a heart attack as compared to patients on naproxen; and (b) patients on Vioxx were 2.3 times more likely to suffer serious cardiovascular disease (including heart attack,

ischemic stroke, unstable angina and sudden unexplained death) as compared to patients on Naproxen.

28.    On March 27, 2000, Merck issued a press release leading off with the finding that Vioxx caused fewer digestive tract problems than naproxen.  Merck continued to assert that it was not that Vioxx caused cardiovascular problems, but that naproxen protected against them.

29.    In June 2000, in industry sponsored studies presented to European United League Against Rheumatism (EULAR, an organization of which Merck is a corporate sponsor) it was shown that Vioxx use resulted in a statistically significant increase in hypertension and myocardial infarction.

30.    In August 2000, Merck denied the studies presented to EULAR in *Pharmacy Today*, the official publication of the American Pharmaceutical Association.

31.    From March 2000 through September 2004, Merck continued to represent that it was not that Vioxx caused cardiovascular problems, but that naproxen protected against those problems.

32.    Merck engaged in a massive advertising and sampling program, reportedly employing an additional seven hundred (700) salespersons to "detail" Vioxx to physicians.  The effect was a more than $2 billion profit for Merck in 2000 and a 23 percent market share for Vioxx.

33.    In November 2000, *The New England Journal of Medicine* published the VIGOR study, (VIGOR = Vioxx Gastrointestinal Outcomes Research).

34.    In February 2001 an FDA Advisory Panel recommended that FDA require a label warning of the possible link to cardiovascular problems.

35.     In documents dated February 8, 2001:   According to the FDA Advisory Committee Briefing Document, in the VIGOR study the potential advantage of decreasing the risk of complicated [gastrointestinal side effects] was paralleled by the increased risk of developing cardiovascular thrombotic events.  An FDA memo discussing the overall safety of Vioxx related that the VIGOR study found there were more overall deaths among study participants taking Vioxx than those taking Naproxen (22 and 15, respectively).

36.     In April 2001 Public Citizen, a well-respected national non-profit public interest organization, advised the public not to use Vioxx because of the potential heart-related risks. Despite the results of the VIGOR study and the warning from Public Citizen, Merck continued to promote the drug in a way that minimized this risk.

37.     On May 22, 2001, Merck issued a press release through the *PR Newswire* that stated "In response to news and analyst reports of data the Company first released a year ago, Merck & Co Inc. today reconfirmed the favorable cardiovascular safety profile of Vioxx."

38.     On August 22, 2001 Drs. Eric Topol and Steven Nessen's article "Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors" was published in the *Journal of the American Medical Association* (JAMA) and reported the findings of the Cleveland Clinic's study that  "current data would suggest that use of these so-called 'Cox-2 inhibitors' might lead to increased cardiovascular events."

39.     On August 31, 2001, the day before the *JAMA* article was published, Merck commented in a published report in *Bloomberg News* that "We have additional data beyond what they [Topol and Nessen] cite, and the findings are very, very reassuring, Vioxx does not result in any increase in cardiovascular events compared to placebo."

40.     On August 23, 2001 Merck stated in a press release that "the Company stands behind the overall and cardiovascular safety profile. . . . of Vioxx."

41.     On September 17, 2001 the FDA warned Merck to stop misleading doctors about Vioxx's effect on the cardiovascular system, ordering Merck to send doctors a letter "to correct false or misleading impressions and information" about Vioxx's effect on the cardiovascular system.  The FDA warned Merck that its promotional campaigns for Vioxx were minimizing the cardiovascular risk of the drug and misrepresenting the results of the 2000 study:

> You have engaged in a promotional campaign that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx.  Specifically, your promotional campaign discounts the fact that the VIGOR study patients in Vioxx were observed to have a four to five fold increase in myocardial infarctions (MI's) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).

42.     Merck was also aware at this time of the increased risks of thrombotic (blood clotting) adverse effects such as strokes and blood clots in the legs, hypertension and altered kidney function.  However, Vioxx was by them a blockbuster moneymaker ($1.5 billion in 2000 and then $2.5 billion in 2003) and Merck decided to protect its cash cow at all costs.

43.     On January 12, 2002 Dr. Wayne A. Ray, a Professor of Preventative Medicine at Vanderbilt University, and others reported in an article published in *The Lancet* that naproxen did not have significant protective cardiovascular effect and that Vioxx, when taken at higher dosages that had become common, posed an increased risk of heart-related problems.

44.     In April 2002 the FDA told Merck to add information about cardiovascular risk to the Vioxx label.

45.     On October 5, 2002 the study done at Vanderbilt University, published in *The Lancet* noted that patients taking 50 mg of Vioxx for more than 5 days demonstrated a 70% greater likelihood of developing coronary heart disease (CHD).

46.     In 2002 Merck was spending more than $100 million a year in direct-to-consumer advertising.  Such monies were used as direct representations of Merck's claims that Vioxx was safe, clearly underestimating the risks of cardiovascular events.

47.     In 2002 and 2003 Merck refused the requests from the American Heart Association, the National Stroke Association and the Arthritis Foundation that it conduct additional safety studies, claiming that Vioxx was safe and that it did not plan to conduct any such study.

48.     On October 30, 2003 an article in *The Wallstreet Journal* reported that another study sponsored by Merck and presented at the annual meeting of the American College of Rheumatology confirmed an increased risk of heart attacks in patients taking Vioxx.  According to *The Wallstreet Journal*, within the first 30 days of taking Vioxx the risk of a heart attack was increased 30% as compared to Celebrex.  This study looked at the records of 54,475 Medicare patients, all of whom were over 65, and was described by Eric Topol as "the best study to date."

49.     Through October 2003 almost 2,000 adverse cardiovascular events had been voluntarily reported to the FDA.  Those events included myocardial infarctions, cardiac arrests and cardiac failures.  The FDA's Adverse Event Reporting System (AERS) is a voluntary system, and an FDA official has estimated in testimony before an FDA Advisory Committee that 90% or more of the adverse events are not reported to the FDA.

50.     In 2003, Dr. Jerry Avorn, a Divisional Director at Brigham and Women's Hospital in Boston, and colleague Dr. Daniel H. Solomon reported on a Merck-financed study based on a

survey of patient records that found Vioxx, even at some moderate dosages increased cardiovascular risk.

51.     Merck disputed the findings of the Avorn-Solomon study, and the name of the company epidemiologist who had worked on it was removed from the report before it was published in a medical journal.

52.     In 2003 worldwide sales of Vioxx in 2003 totaled $2.5 billion.

53.     From 1999 through 2004, Olympic gold medalists such as Dorothy Hamill and Bruce Jenner hawked Vioxx.

54.     From January through June 2004, Merck spent an estimated $4.5 million advertising Vioxx.

55.     In May 2004, the results of a study funded by the Canadian government were published in *The Lancet*.  The study culled data from 1.3 million elderly patients (66 and older) taking Vioxx vs. Celebrex vs. a common arthritis pain pill (NSAIDs) vs. no medication.  The records from approximately 130,000 persons randomly pulled from the population base found that persons taking Vioxx had an 80% increase in hospital admissions for congestive heart failure within one year of starting therapy when compared to persons taking NSAIDs.

56.     On August 25, 2004, Dr. David Graham, Associate Director for Science in the FDA's Office of Drug Safety, presented results of a database analysis of 1.4 million patients that concludes that Vioxx users are more likely to suffer a heart attack or sudden cardiac death than those taking Celebrex or an older NSAID.

57.     It has been reported that Dr. Graham and his collaborators had linked Vioxx to more than 27,000 heart attacks or sudden cardiac deaths from the time it came on the market in 1999 through 2003.  In fact, the study drew on data from about 1.4 million Kaiser Permanente

patients who had taken one of the NSAIDs. That included 40,405 patients who had taken Celebrex and 26748 who had taken Vioxx. The *projections* of the potential impact came from figuring out a rate of increased risk among the Kaiser patients, and then applying that to the number of American prescriptions for Vioxx in the years 1999 through 2003. Of the additional 27,785 serious heart problems the study projected for the entire American population, 12,940 would have come in patients taking high doses of Vioxx and 14,845 with low doses. The actual numbers in the study data base were far smaller-the study estimated that of 58 cases of heart attacks or sudden cardiac death among patients in the database who were taking the low does of Vioxx, 21 would not have occurred had they all been taking Celebrex. For the high dose, it was 9.7 serious heart problems out of 10 that would not have happened.

58.    Dr. Graham's study found that people taking a high dose of Vioxx were 3.69 times more likely to have a serious cardiac event as people taking Celebrex, while the ratio for people taking the low dose was 1.5. The study also concluded that there was no evidence of a "substantial benefit with the high dose strength" of Vioxx that would "counter-balance the level of cardiovascular risk" show in various studies of the drug.

59.    On August 26, 2004, and thereafter, Merck continued to minimize the risks. Merck stated in a press release that "Merck stands behind the efficacy, overall safety and cardiovascular safety of Vioxx."

60.    In August 2004, Merck complained to the FDA in an e-mail since provided to Senate Finance Committee Chairman Charles Grassley that the FDA had not lived up to a prior agreement to alert the company before releasing any negative information about Merck products.

61.    In 2003-2004, Merck began a three-year, 2600 patient randomized trial to see whether Vioxx could claim that it protects against the recurrence of colon polyps, which can

become cancerous. After 18 months of treatment, researchers had observed a higher heart attack and stroke risk in patients on Vioxx, when Vioxx was compared to a placebo and not another NSAID. The FDA says that 3.5% of the subjects on Vioxx had suffered a heart attack or stroke, compared with 1.9% on placebo.

62.     On September 14, 2004, Merck delivered the heart attack and stroke data for the previous six months to the colon polyp trial's Data and Safety Monitoring Board, an independent panel of specialists hired to catch harmful developments during trial.

63.     From the beginning of the study, the safety monitors noted an increased rate of hypertension among the Vioxx group, and in 2003 and early 2004, they found more people in the Vioxx group were having cardiovascular events than in the placebo group. The numbers were small, in part because people with heart disease had been screened out of the trial.

64.     On September 23, 2004, Merck claims it learned this day that patients taking Vioxx in a study were twice as likely to suffer a heart attack or stroke as those on placebo.

65.     On September 30, 2004, Merck withdrew Vioxx from the United States and more than 80 other countries in which it was marketed.

66.     On October 1, 2004, Merck released information that it estimates that there were 105 million prescriptions written for Vioxx from May 1999 through August 2004, and estimated the number of patients who have taken Vioxx in the United States since the 1999 launch is approximately 20 million.

67.     In October 2004, Dr. Eric Topol, Chief of Cardiovascular Medicine and Chief Academic Officer of the Cleveland Clinic as well as a co-author of the VIGOR Study, estimated Vioxx may have caused 30,000 to 100,000 heart attacks and strokes, many of them "preventable" because patients could have taken other drugs.

68.     Dr. Topol wrote in October 21, 2004 issue of *The New England Journal of Medicine*:

> Sadly, it is clear to me that Merck's commercial interest in rofecoxib [Vioxx] sales exceeded its concern about the drug's potential cardiovascular toxicity.  Had the company not valued sales over safety, a suitable trial could have been initiated rapidly at a fraction of the cost of Merck's direct-to-consumer advertising campaign.

69.     Dr. Topol is quoted to have said:

> Why didn't they stop the DTC [direct-to-consumer] marketing?. . . That's the tragedy here.

And,

> [Merck's action to withdraw Vioxx was] the right decision about three years too late.  This is the sort of thing that Merck should have studied earlier, but they were too busy refuting the warning signs.

70.     In October 2004, Dr. Jerry Avorn is quoted as saying:

> It is a terrifying testimony to the power of marketing.

71.     The Merck spokesperson made further misrepresentations by stating on September 30 that the colon polyp trial was the first clinical trial to show such results and the company took "immediate" action on receiving the data.

### Count I – Strict Products Liability

72.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

73.     Merck created, manufactured, designed, tested, labeled, packaged, marketed, sold, advertised, distributed, supplied and/or placed into the stream of commerce the dangerous drug Vioxx described herein, which Merck distributed throughout the world, including Ohio.

74.     Under the doctrine of Strict Product Liability, Vioxx was defectively designed, marketed, and manufactured and was unsafe for its intended purposes at the time the drug left the control of Merck and was sold.

75.     Plaintiff was using the Vioxx in the manner for which it was intended and/or in a reasonably foreseeable manner.

76.     Plaintiff was not aware of and reasonably could not have discovered the dangerous nature of Vioxx.

77.     The drug Vioxx was unaccompanied by proper warnings regarding the injuries associated with the use of it and the comparative severity and duration of such injuries.

78.     The warning given did not accurately reflect the symptoms, scope, frequency, or severity of such injuries.

79.     Additionally, or in the alternative, Merck failed to perform adequate testing in that the adequate testing would have shown that Vioxx possessed undisclosed risks of potentially serious injuries.

80.     Full and proper warnings accurately and fully reflecting the symptoms, scope, frequency, and severity of the harm should have been made with respect to the use of this drug.

81.     Merck knew, or should have known, that Vioxx was a dangerously defective drug that posed unacceptable risks of serious injury, which risks were unknown and unknowable by the Plaintiff.

82.     Vioxx was defective due to the inadequate warnings or instructions because, after Merck knew or should have known of the risk of serious injury from Vioxx use, it failed to provide adequate warnings to Plaintiff and/or Plaintiff's physicians, and Merck continued to aggressively promote the dangerously defective product.

83.    Merck failed to give warnings (1) that could reasonably be expected to catch the attention of a reasonably prudent person, in the circumstances that the product was used; (2) that were comprehensible to the average user; and (3) that conveyed a fair indication of the nature and extent of the danger.

84.    The failure to give these warnings rendered Vioxx dangerous to an extent beyond which would be contemplated by the ordinary users of the product with ordinary knowledge common to the community.

85.    The drug Vioxx was defective in design or formulation in that, when it left the hands of the manufacturer and/or distributor, the foreseeable risks far exceeded the benefits associated with the design or formulation.  Alternatively, the drug Vioxx was defective in design or formulation, in that, when it left the hands of the manufacturer and/or supplier, it was unreasonably dangerous, it was more dangerous than an ordinary consumer would expect, and it was more dangerous than other drugs of the same class as Vioxx.

86.    Merck is liable under the theory of Strict Product Liability as set forth in Section 402A of the Restatement of Torts and under Ohio Product Liability Law.  Merck was at all times material hereto engaged in business of designing, manufacturing, distributing, marketing, promoting, and placing into the stream of commerce the drug.  Merck is in the business of selling Vioxx with the expectation that such product would reach the user without substantial change in the condition in which it was sold.   The drug Vioxx reached the ultimate users without substantial change in the condition it was sold.

### Count II – Negligence

87.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

88. Merck was negligent in designing, manufacturing, marketing, promoting, distributing and placing into the stream of commerce; a product which they knew or should have known was not safe.

89. Merck was also negligent in the post-market safety surveillance of such drugs, and negligently failed to detect and warn about the increased frequency of adverse events associated with such drug.

90. Merck negligently failed to adequately warn Plaintiff, Plaintiff's physicians and insurance companies about the adverse events associated with Vioxx.

91. Further, Merck failed to warn the Plaintiff, Plaintiffs' physicians and/or insurance companies or the public that Vioxx was not safe. Merck assumed a duty to warn the Plaintiff directly, because Merck voluntarily contacted entities other than the Plaintiff's physicians when marketing and aggressively promoting this drug.

92. Further, Merck failed to first determine that the product was safe for all applicable foreseeable uses.

### Count III – Misrepresentations and Fraud

93. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

94. Merck, through advertising, labeling, and other communications, made misrepresentations to physicians and the public, including the Plaintiff, Plaintiff's physicians and/or Plaintiff's insurance companies, about the safety and efficacy of Vioxx for controlling pain caused by inflammation.

95. Physicians and their patients, including the Plaintiff, justifiably relied on these misrepresentations.

96.     The harm to Plaintiff was caused by such misrepresentations, since such damages were produced by Merck's misrepresentations.  See Restatement (Second) of Torts Section 402B.

97.     Further, Merck, through advertising, labeling, promotion, and other communications intentionally made misrepresentations to physicians and the public, including the Plaintiff, Plaintiff's physicians and./or Plaintiff's insurance companies, about the safety and efficacy of Vioxx for controlling pain.  From its inception until its withdrawal, the labeling for Vioxx and other representations of Merck were inaccurate and misleading.

98.     Merck knew, or should have known, that Vioxx was not as effective as competing anti-inflammatory pain medications, but Merck chose to disregard, downplay, and conceal that information.  This conduct constitutes an intentional and/or negligent misrepresentation and concealment.

99.     Physicians and their patients, including the Plaintiff and Plaintiff's physicians, relied on Merck's fraudulent misrepresentations, and Plaintiffs were harmed as a result.

100.     Further, because Merck's conduct was willful, reckless, intentional and maliciously fraudulent, Plaintiff is entitled to an award of exemplary damages in order to punish such conduct and to deter such conduct in the future.

**Count IV – Civil Conspiracy and Commercial Bribery**

101.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

102.     Merck committed civil conspiracy, commercial bribery and conspiracy to commit commercial bribery in that fiduciaries of Merck knowingly and/or intentionally offered, conferred, or agreed to confer benefits, gifts, and/or gratuities or conspired to do the same upon

physicians, pharmacists, and insurance companies for the purpose of enticing these entities to use the drug Vioxx, to switch patients from other and more effective anti-inflammatory drugs to Vioxx, and to convince their patients and others of the safety and effectiveness of Vioxx.

### Count V – Breach of Implied Warranty of Merchantability

103.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

104.    Defendant's Vioxx was not of merchantable quality and not fit for the ordinary purposes for which such a product is used.

105.    At the time Merck marketed, sold and distributed Vioxx for use by Plaintiff, Merck impliedly warranted the product to be for a particular purpose and for the ordinary purpose for which the product was to be used, i.e., the treatment of arthritis pain and acute pain. Merck had reason to know of the particular purpose for which Vioxx was prescribed.  Plaintiff and/or Plaintiff's physicians reasonably relied upon the skill and judgment of Defendant to select or furnish a suitable product that was of merchantable quality and safe for its intended use.

106.    As a direct and proximate result of Defendant's defective and unreasonable dangerous Vioxx and the breach of these implied warranty of merchantability, Plaintiff was injured and will continue to suffer injury, harm and economic loss as alleged herein.

### Count VI – Breach of Implied Warranty of Fitness for a Particular Purpose

107.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

108.    Defendant's Vioxx was not fit for its particular purpose of safely treating arthritis pain or acute pain.

109.   Defendant Merck actually and/or constructively knew of the purposes to which its Vioxx was to be used.

110.   Plaintiff relied upon Defendant to furnish Vioxx in a condition suitable for its particular purpose.

111.   As a direct and proximate result of Defendant's manufacture, distribution and sale of defective and unreasonably dangerous Vioxx, and its breach of implied warranty of fitness for a particular purpose, Plaintiff was harmed as aforesaid.

### Count VII – Breach of Express Warranty

112.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

113.   Merck expressly warranted to Plaintiff and/or Plaintiff's physicians that Vioxx was safe and effective when Merck knew the product had never been proven as safe and effective, when Merck knew that substantial questions existed with respect to the safety and efficacy of this product, and when, in fact, the product was not safe or effective for all foreseeable uses.

### Count VIII – Gross Negligence/Malice

114.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

115.   Plaintiff also alleges that the acts and omissions of Merck, whether taken singularly or in combination with others, constitute gross negligence/malice which proximately caused the injuries to the Plaintiff.  Merck's conduct was more than momentary thoughtlessness or mere inadvertence, but it amounted to such an entire want of care so as to constitute gross negligence, malice, and willful and wanton misconduct.

116.    Thus, Plaintiff seeks punitive/exemplary damages in an amount that would punish Merck for its unconscionable conduct and which would deter other similarly situated drug manufacturers, distributors, and promoters from engaging in such misconduct in the future.

## Count IX – Agency

117.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

118.    Whenever in this Complaint it is alleged that Merck did any act or thing, it is meant that it performed and participated in such act or thing, or that such act was performed by the officers, agents, employees or representatives (including, but not limited to "detail men" and salespersons) of Merck.

119.    In each instance, the officers, agents, employees or representatives of Merck were then authorized to and did in fact act and/or make representations on behalf of Merck, or otherwise acted under the guidance and direction of Merck and Merck ratified all such acts.

## Count X – Allegations and Causes of Action in the Alternative

120.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

121.    All factual allegations and/or causes of action alleged by Plaintiff herein are made in the alternative.

## Count XI – Causation

122.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

123.    Each of the aforementioned acts, omissions, negligence, gross negligence, malice and/or knowing injury to the elderly, breaches of warranty, and/or defective products of Merck was a proximate and/or a producing cause of the injuries to Plaintiff.

## Count XII - Loss of Consortium

124.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully restated herein.

125.    Plaintiff, Anna Scoble, as a direct and proximate result of Defendant's negligence and the resulting injuries, including but not limited to, personal injuries, medical expenses, and pain and suffering sustained by Plaintiff Walter Scoble, has suffered the loss of her husband's companionship, society, services, and consortium.

## Prayer

WHEREFORE, Plaintiff demands the following:

1.    Judgment in Plaintiff's favor and against Defendant in an amount to be determined by the Jury but in no event less than $75,000;

2.    Past and future compensatory damages in an amount in excess of the jurisdictional limit, including medical expenses and compensation for pain and suffering;

3.    Exemplary and punitive damages in an amount in excess of the jurisdictional limit;

4.    All elements of interest, including but not limited to pre-judgment and post-judgment interest as allowed by law;

5.    Costs of court; and

6.    Such other and further relief to which Plaintiff may show entitlement.

Respectfully submitted,

//s/    Pamela A. Borgess
Pamela A. Borgess (Ohio Bar No. 0072789)
ZOLL & KRANZ, LLC
6620 W. Central Ave., Suite 200
Toledo, OH  43617
(419) 841-9623
Fax: (419) 841-9719
*Attorney for Plaintiffs*

## JURY DEMAND

Plaintiff hereby demands a trial by jury on the all issues set forth above.

//s/    Pamela A. Borgess
Pamela A. Borgess